All right, Mr. Thakkar, or Ms. Thakkar, I apologize, you may proceed. May it please the court, my name is Priyal Thakkar, I'm here with my colleague Karen Alley from the law firm of Hirsch Robinson and Allen, and we represent the appellant Jacob Beltran. At the outset, I want to emphasize that I'm not asking this court to endorse or approve of Jacob's actions. Illinois is a no-fault state. This appeal involves issues based purely on financial grounds, and the Illinois legislature has made it abundantly clear that issues of division and support should be adjudicated without regard to marital misconduct. We're here today because of three critical errors made by the circuit court, each of which we ask this court to reverse. One, the circuit court's award of dissipation in the amount of approximately $150,000 to appellee Caitlin Beltran. Second, the circuit court's imputation of $106,000 in annual income to Jacob for calculation of child support and maintenance purposes. And third, the circuit court's award of approximately all of the assets of the marital estate to Caitlin and approximately all of the liabilities to Jacob. The first issue is dissipation. The circuit court's dissipation ruling is against the manifest rate of the evidence because Caitlin failed to establish a prima facie case. As your honors know, dissipation follows a clear burden shifting mechanism, and Caitlin needed to make a preliminary showing of three elements to establish a prima facie case. First, Jacob's use of marital property. Second, for a purpose unrelated to the marriage, and third, during a time the marriage was suffering from an irretrievable breakdown. Caitlin did not meet this burden. Caitlin relied almost entirely on a self-made chart attached as Exhibit A to her Notice of Intent for Anticipation and her own self-serving testimony. The self-made chart detailed numerous alleged transactions totaling approximately $174,000 across four credit cards, a Blue Crash card, two United cards, and a Centurion card. However, there are several problems with Caitlin's self-made chart. First, the self-made chart lacks supporting documentation or basic yet critical details, like who the credit cards belong to, who made the alleged transactions, whether the credit cards were paid off, and what funds were used to pay them down if they were indeed paid. At best, it is an impermissible Illinois Rule of Evidence 1006 summary. Next, the chart erroneously includes transactions totaling approximately $53,000 from August to September 2021, well before the underbudgeted date of the marriage's irretrievable breakdown in October 2021. Isn't there a difference between the breakdown and the period of time leading up to the breakdown where the marriage is still irretrievably broken? Correct, Your Honor. The date that we're going by is when the marriage began undergoing an irretrievable breakdown, which is noted as October 21 in Caitlin's Notice of Intent to Claim Anticipation, which was affirmed by her testimony at trial. That was certainly the date in the notice, but did she not testify that she believed the affair began in May? Correct. She may have testified that she believed the affair began in May. However, on appeal, she also argued that she did not know when the affair truly begun. Well, it's hard to imagine the affair began in October and they got married in November. It would seem, I'm, stranger things have happened, but... Correct, Your Honor. When the irretrievable breakdown of the marriage began is a finding of fact that the circuit court needed to make. The circuit court explicitly did not make any specific finding of fact. The appellate court is not a finder of fact and therefore were tied to the record. Well, isn't, would it not be reasonable to conclude that at the point in time where Jacob left the police department and started working for Tina, that that, and I believe that was in August, that that was in likelihood the date where the breakdown began? I disagree, Your Honor, because while employment negotiations or job negotiations were going on, Caitlin was a part of that. The benefits that Jacob was going to gain from a prospective job opportunity with Tina, Caitlin was very much a part of that, which is why she was included in an employment letter, which was made out to both Jacob and Caitlin. There was a joint account between Jacob, Caitlin, and Tina. Jacob repeatedly emphasized all of these errors to the circuit court, but the circuit court neither acknowledged the error, nor did it subtract the substantial amount of approximately $53,000 in granting Caitlin's dissipation claim. Lastly, the chart references transactions on two credit cards, one United card and one Centurion card that did not even belong to Jacob. Regarding the third card listed, which is the blue cash card, Caitlin neither provided any evidence to show which source of funds were used to pay off the card, nor did she provide complete statements encompassing all of the transactions listed in her self-made chart. So the court finds that a prima facie case is banked, and all Jacob has to do is say, I didn't pay these, these weren't attributed to me, none of that testimony happened, right, even though the burden had shifted. Well, our argument on appeal is that the burden had not. Right, but assuming for the sake of argument, as the trial court found, the burden shifted, there was no attempt to rebut the burden. Well, Jacob did testify regarding certain charges. And I agree with that, but... Right. And the judge basically credited him for all the things he explained. Yes, Your Honor. Right? Yes. Jacob also, his testimony also involved him stating he never owned any of the cards. So it is his testimony that he never owned the United card ending in, the Centurion card ending in 5005, and the subpoena response, which is part of the exhibit, establishes that the owner of the card was Tina Trahan. The other United card ending in 2559, he testified at trial that he did not own, although he didn't make certain expenditures using that card, but that was not his card. Instead, finally, regarding the remaining United card ending in 7843, which did belong to Jacob, Kaitlin failed to provide any statements showing that these cards were paid off or how they were paid. Instead, in her closing argument, Kaitlin simply concluded that it was clear that Jacob must have paid all the credit card balances using marital funds because a heavily redacted American Express subpoena response showed a payment of approximately $27,000 under Jacob's name. On an unrelated American Express card ending in 2003 from an unknown bank account ending in 8951. This argument is a red herring. Not only is the card ending in 2003 irrelevant to Kaitlin's dissipation claim as it was not included in it, but there's no evidence in the record to establish who owned either the card ending in 2003 or the unknown bank account ending in 8951, which was used to make the payment, let alone whether the funds used were marital assets. Despite having access to Jacob's bank statements, Kaitlin provided no evidence. Assuming for the sake of argument that the funds used to pay for items that were for Jacob's benefit did not come from joint accounts or even an account perhaps in Jacob's If this was monies advanced, if you will, by Tina, isn't there evidence in the record that Tina was going to use gifts in lieu of income as income? Wasn't there a suggestion of that? There was a suggestion that Jacob's finances were intimately intertwined with Tina's finances, yes. And that they were going to literally try to reduce his income essentially by gifting all kinds of people in the family money rather than income. We won't comment on the ethics of it, but that seemed to be what was planned. That was part of an employment letter that was signed by Tina that she would be gifting the family certain amount of monies and then there was a ceiling to what the... So couldn't that fairly factor into whether a prima facie case was made such that all Jacob has to do is explain, no, this monies, they don't fall into that type of a scheme, for lack of a better word. No, Your Honor, because a primary element of proving this evasion is the use of marital funds. These were not marital funds. Well, that's the question, isn't it? I mean, if I'm gifting you things in lieu of income to keep it secret, they are marital funds. They're just being... They're not... It's a scheme, if you will, potentially. Well, it is true that under certain circumstances, gifts can be considered as income. However, those were not proven here. Was there a suggestion such as there was a prima facie case? There was no suggestion as to there being any marital funds that were used. All that Tina was gifting Jacob were trips and tickets to the Super Bowl. They don't count as... They don't account as income. Harley Davidson's. Correct, which was in his name and which was his personal property. This case exemplifies why self-serving testimony and unsupported allegations alone cannot form the basis of a valid dissipation claim. And we know this because Illinois law tells us the same. In In Re, the Marriage of Butterick, the appellate court found that a husband failed to set for the prima facie case of dissipation when he failed to introduce account statements or other evidence in support of his claim, only relied on testimony, and made no attempts to tie those withdrawals to those alleged in his notice of intent to claim dissipation. Similarly, in Manker, this court ruled that the wife failed to establish a prima facie case of dissipation by merely listing the amount of the husband's ATM withdrawals. In contrast, in this case, the circuit court held in the face of no evidence that Caitlin made a prima facie case of dissipation, that Jacob used marital funds to make payments towards his credit cards, and that he dissipated approximately $150,000 in marital funds. Therefore, the circuit court's award of dissipation to Caitlin was against the manifest rate of the evidence, and the matter must be reversed. Turning to the next issue, imputation of income. The circuit court abused its discretion by imputing Jacob's income at $106,000 for calculating child support and maintenance, a determination that once again lacks evidentiary support. The circuit court explicitly stated that the reason for its imputation of $106,000 gross per year to Jacob was because he earned that as a police officer before he stopped working in that capacity, and he lost that job based on his actions of marrying or attempting to marry Ms. Tina Trahan. The record confirms that is not the case. The only dime Jacob earned at an annual rate of $106,000 was in 2019. Can I ask you a question? Yes. So, in 2019, he was making $106,000. So, he was making over $100,000, but the Elmhurst Police Department, he says he voluntarily quit that job. He was making presumably over $100,000 with the Aurora Police Department. He says he voluntarily left that job. He says he voluntarily declined to accept a $200,000 plus job with Tina. So, within a period of years leading up to the end of the marriage, he has either quit or declined six-figure jobs. So, how is the trial judge abusing its discretion by imputing income in this context when he's working as a limo driver for $36,000? How is that an abuse? Judge, when he quit the Elmhurst Police Department in 2021, there's undervoted testimony that that was done by agreement of both parties. His income at that time in 2021, and again, this is undervoted evidence, was $70,000, moving to Aurora. When he moved to Aurora, he was earning at approximately... Well, wait a minute. Where's that? Does that include bonuses and overtime? That is from his payroll and wage stubs and his tax returns. For a full year? For... I will double check that and provide an answer in my rebuttal.  Regarding the employment letter, there was an unsigned employment agreement that was entered into the evidence. It was unsigned and does not carry any weight. There is another employment letter signed by Tina Trahan made out to both Jacob and Caitlin. There are no specifications as to who she's offering the job to. It was a jointly named letter. He testified he declined to take that job because he would take too much time away from the family. Correct. He did testify that, Your Honor. However, the letter also stated that the most that he would be paid was in the six figures, but it did not note a salary that was the ceiling. That was the floor. The ceiling was in the six figures. I'd like to quickly move on to our final issue, which is the distribution of marital property. The circuit court abused its discretion by awarding Caitlin approximately all of the assets of the marriage while imposing nearly all of the liabilities to Jacob. Further confounding on its error, the reason that the circuit court awarded the entire equity in the marital residence to Jacob was for an offset for dissipation. As we argued before, the dissipation finding was erroneous. The grant of dissipation was erroneous. Consequently, the grant of the entirety of the assets in the marital estate being awarded to Caitlin while Jacob is left with only liabilities. It results in not just an inequitable decision, but it also leaves Jacob with a position from which he cannot start anew, which is in violation of what the appellate court held in Kalasov, where the appellate court found that the trial court's distribution violated the principles of equity by awarding all the benefits of the marriage to one party while placing all of the burdens on the other. Here, we have a similar situation. Caitlin received nearly all of the marital assets, if not all, and Jacob only being saddled with debt. Consequently, we respectfully ask this court to reverse the trial court's decision and recommend the case for a more equitable distribution of the marital estate. The mortgage. Didn't Caitlin get the mortgage? Wasn't she responsible for the mortgage? Correct. However, we only noted the equity, which is at approximately... You noted the equity, but you keep arguing that you get all of the liabilities. Isn't a mortgage a liability? Well, it wouldn't be a true liability because... She got equity. I understand that, but... Correct. Okay. I just want to confirm that. Does she have any questions? No. Mr. Carr, thank you. You'll have an opportunity in reply. Thanks, Your Honor. Mr. Miles. Good morning, Your Honors. Good morning. I'm Edward Miles on behalf of the appellee, Caitlin Beltran. Counsel, Your Honors, good morning again. Initially, I'd like to point out that there's two factual statements within Mr. Beltran's reply brief and that he just argued, which are not correct. On page 9 within Mr. Beltran's brief, he cites that the record is devoid of any evidence showing the ownership of two accounts ending in 2003 and 8951. That's simply not true. I'd point, Your Honors, to sub C111, which essentially is an American Express card statement in Jacob Beltran's name, and then it has over a period of pages, I mean, transactions by Mr. Beltran, including Mr. Payments by Mr. Beltran as well. From essentially trying to search the PDF, I think that account is referenced roughly 35 times within supplemental C, I mean, as a whole, and I can provide those citations to Your Honors if you would like. The second statement is, but Caitlin glosses over the fact that her self-made spreadsheet included no transactions for any credit card ending in X2003. Again, that's not accurate. On sub C116, there's several transactions on Mr. Beltran's American Express blue card ending in 1003, which are identical to her dissipation claim. These include charges between essentially Chicago Flying to LAX by Mr. Beltran, a charge for Lululemon, and a charge at Adidas, the factory store. And what I think really happened is, I mean, if you look at, Your Honors, look at sub C1016, this is now again referring to the American Express subpoena, there is a page which shows that Mr. Beltran replaced his existing American Express blue card ending in 1005 with a new card for 2003, and that card was shipped to his residence at the time at essentially Los Angeles, California. I'd like to speak to Mr. Beltran's argument, I think, within his brief, that essentially the trial court is imposing moral superiority against Mr. Beltran. That allegedly, I think, Mr. Beltran's argument is because of his affair or his relationship with his girlfriend, Ms. Trahan. Judges, respectfully, Mr. Beltran's finances are the issue the trial court was trying to decide, and that road leads to Ms. Trahan. Issues that Mr. Beltran is appealing and asking Your Honors to rectify include essentially his income as well as the division of debt. As Your Honors were notating, I mean, essentially Ms. Trahan offered Mr. Beltran income or a job of $225,000. She transferred roughly that same amount into Mr. Beltran's individual account. My client was later added to that account as a joint account, but my point is that, I mean, essentially the relationship and the financial connection between Mr. Beltran and Ms. Trahan involve the issues of appeal. Regarding the debt, there's a debt of $75,000 that essentially Mr. Beltran is arguing to this court that it's not fair that he assumes that debt. I'd point out that, again, within the actual record, that was an unsigned promissory note between Mr. Beltran and Ms. Trahan. From an evidentiary perspective, essentially Mr. Beltran didn't even include that on any of his financial affidavits. And so my point is, this is not about moral superiority. This is about trying to understand the finances of Mr. Beltran, which inherently involve, I mean, the relationship and the financial transactions between himself and Ms. Trahan. Judges, regarding the prima facie case, as Your Honors may note within our response, there's a two-pronged approach that we are taking in terms of Mr. Beltran's argument. Specifically, I'd like to point out what Caitlin offered, I mean, to support her prima facie case dissipation. A month before the trial, she served a notice of intent for dissipation. That was on August 11th, and the trial started on September 8th. That dissipation notice with spreadsheet was color-coded and had specific dates and transactions and identified specific cards. The courts have held, I'm citing now the Zesny case, that essentially sole access to debt without knowledge of the other can and have been held to find them essentially dissipation of assets. At trial, the evidence clearly indicates that Mr. Beltran was making repeated payments towards his American Express cards. Within Mr. Beltran's brief, he cites 1426, that's a reference to the record, and there's a string of transactions that's redacted by American Express which show essentially payments by Mr. Beltran. I point your honors also to subsea 1014 and 1015. Those are additional essentially payments within the American Express subpoena response that show payments by Mr. Beltran to the card that he claims that does not exist, which is his American Express 2005 card. So on its face, prima facie means literally on its face, does Mr. Beltran know what's being alleged? My point is that a month before the trial, there's specific activities and specific transactions that essentially he needs to respond to essentially once the burden has shifted to him, which the trial court found. How did these American Express records come in at trial? Through a subpoena judge. I offer them as admission, as a certification. I forget if it was objective. I know how you received them through a subpoena. I'm puzzled as to how, so you receive the documents, how do they come to evidence they were stipulated to? Did you lay a foundation? Did you ask for them to admit the documents? Yes, and there was a proffer as well, Judge. So I laid a foundation. I think the argument was that they were self-authenticating because they had the notice that it was certified as a record. And then I made a proffer as to actually receiving the copy from myself and it was a duplicative of what was intended or was what was entered by the trial judge. So yes. Any objection on the other side? I don't think so, Your Honor. I'm not 100% positive on that. Okay. I may proceed, Judge. Please. Sorry. Regarding essentially the argument that Caitlin put within her notice of intent for dissipation that the marriage was breaking down in October of 2021. Why isn't she stuck with that notice date? Well, as Your Honor indicated, her testimony was not just that date. I agree with that, but what's the purpose of the notice? Well, I think the purpose of the notice is fairly to put Mr. Beltran on notice as to, one, the period of activity and the transactions that were being alleged as dissipation. From my perspective, to hold it against her for lack of a better term would be essentially a judicial admission. And I don't think that it's a concrete fact that she knows the actual breakdown of the marriage for it to be, I mean, a judicial admission to be applied. So for example, I mean, today's date is January 15th, 2025. I mean, that's a concrete fact that, I mean, I can speak to or I mean, you know, I mean, a person is in a position to say yes or no. Regarding when the marriage was in the process and then irrevocably breaking down, I think it's something different. October of 2021, Caitlin testified, is essentially when Mr. Beltran told her that he did not want to be in a marriage with her going forward. I mean, what was he doing in the months prior? I don't think she really has the correct mens rea to ever answer that question. I mean, she testified that she thought he was an affair going back from May of 2021. And I'd point out that the dissipation charges, I think, started in August of 2021. So this is not falling back, I mean, a period of, I mean, essentially years, essentially it's two months. Did she provide a basis for her belief when she was testifying that she thinks the marriage, that the affair began in May of 21? I don't think she expanded on it to answer your question, Judge. I think, you know, from my perspective, the activities, I mean, logically indicate when he was in California. I mean, I think with Ms. Trahan, I mean, regarding these purchase of a Harley-Davidson or attending the Super Bowl. But to answer your question, I don't think it was expanded beyond that answer, Judge. The second problem with our analysis regarding property is essentially that dissipation within itself is one section of the statute. I think the court is trying to do its best to unwind a person to all the statutory factors, I mean, the property and the debts of the actual marriage. And I think if we take a step back and look at how the property was actually allocated, it's consistent with the statute. And so, for example, 503, I think, has a clear preference, I mean, to try to keep the primary caretaker within the home. I mean, what happened on this case is Ms. Beltran, I mean, the clear primary caretaker to their three children was awarded the home. She had the debt in her name. Mr. Beltran took the debt that he accrued, I mean, during the pendency of the case. And I'd like to kind of walk through a little bit of the details regarding the debt. The debt primarily consists of three loans. Mr. Beltran testified that essentially he took one loan out, which was subsumed by another, to pay his child support. That was an agreed order that Mr. Beltran entered in terms of setting the support. The agreement did not contemplate that my client would be assigned a portion of the debt. It's not, to me, equitable or fair, I mean, which I think is what 503 demands, that essentially Caitlin pay herself back the child support that Mr. Beltran agreed to. The second loan for $75,000 now is assuming, I mean, Frank, from an evidentiary perspective, I mean, it's an accurate loan. I point out that Mr. Beltran never put that on his financial affidavit, and frankly, he didn't look to admit that loan within his actual case. I impeached him with that loan at the actual trial. So, from an evidentiary perspective, you don't see transactions showing the $75,000 going into the account, and you don't see recurring payments towards the loan. I mean, I think there's questions if the loan even exists. So, pursuant to 503, beyond just essentially awarding the house to a caretaker, I think this gets into Mr. Beltran's standard of living during the merge. 503 provides essentially the courts to look at the relative economic circumstances of the parties. Mr. Beltran lived the life of a 1% person during this actual case. I mean, he attended the Super Bowl, and he went to Lake Como, Italy, and this is now when he's telling the court that he's earning $40,000. My point is Mr. Beltran's testimony did not get into his explanations as to how he was living this standard of living, but at the end of the day, he was doing it however he chose in terms of his actions. My point is Mr. Beltran did not have to answer these questions. He's, of course, entitled to handle the cases he would choose to do so, but when the court's being allocated how to divide up the properties or the debt, the question becomes, Mr. Beltran is not, I mean, essentially an impoverished person. I mean, again, he's living this extreme standard of living, and so for him to take on debt is not unequitable based upon the allocations and his lack of explanation for these extreme standards and high level of livings. This appages me, the last argument regarding essentially imputation of income. I think what the trial court said within its actual ruling is that essentially the court struggled determining Mr. Beltran's income. The court literally said that it's difficult to ascertain what his income is, and the court is trying to be reasonable. I think that's exactly what the statute provides essentially within 505, specifically within section 505, I believe 5. If the court is unable to determine an income, it's to engage in reasonable actions to set support. That's what Judge Felice did, I mean, literally within his findings. Even assuming in argumento that, I mean, the court needed to impute income to him, I don't think it's an unreasonable point to impute income to Mr. Beltran, again, when he was, I mean, getting to the point of turning down a trial for $220,000. For all those reasons, Judge, I just need your honors, I would point out that I think the trial court got it right in regards to dissipation, the division of property, as well as setting support. Assuming in argumento that the court does find that dissipation is inappropriate, I would say the correct remedy is to remand that back to the trial court because rightfully all issues affect each other. So my point is the trial court ruling stated that perhaps if there was another source of property, the court would have awarded interim fees to Ms. Beltran. The trial court did not Ms. Beltran interim fees, but my point is from a financial perspective, I think all issues are interrelated. I'm going to save a few minutes left, so I welcome any questions your honors may have. Accepting for the sake of analysis that Mr. Beltran is underemployed as a limousine driver earning $36,000 a year, how does the judge just pick the number $106,000? Presumably, he's no longer in a position to go back to the police department. So how do we get to $106,000 versus, I just pick a number. How is that the number? It's a number because I think it's the historical earnings Mr. Beltran made before kind of everything devolved, I guess for lack of a better term. It's his historical earnings at a job that he had at the city of Elmhurst for 10 years. Also, I mean respectfully, Mr. Beltran did not offer a job diary. I mean, he clearly had the ability to work as an officer. He did indicate that he attempted to obtain any jobs in that field. He said that he was trying to essentially go back to school to become, I mean, a coach or pursue his love of football, but there's no evidence regarding that as well. And so I think that's a very fair question, your honor. I think a lot of it is contingent upon the lack of evidence that Mr. Beltran offered, but at the end of the day, we know. I mean, we know that he was working at the city of Elmhurst. I mean, before he met Ms. Treypan, and then he had the job at the other city, and then he had... Jay has a question about that. There's a suggestion that his income at the city of Elmhurst was $76,000 or something. That wasn't my recollection on the record. What's your understanding of his income for the city of Elmhurst? $106,000 grossage, all encompassing of his tax return as well as W-2. Okay. Was there any evidence that he could not work as a police officer anymore? I don't believe he offered that. I mean, he quit or he chose... He took the fifth during testimony on a couple of occasions, correct? Within his deposition, he took the fifth, I mean, over 100 times. At the actual trial, I think he took the fifth one time regarding essentially his knowledge of whether or not Tina knew he was married, because this is now involving the invalidity of marriage in McKenna County. But there was no argument... I'll finish. There was no argument that he couldn't be a police officer, that he couldn't return to work as a police officer, or no evidence that he couldn't return as an officer, correct? I think his counsel argued that. I'm not aware of any evidentiary testimony that Mr. Beltran and Arthur Corwin had. I'm sorry, Justice Elwood. No, go ahead. I didn't know that you had a follow-up. So the $106,000 at Elmhurst, was it? Yes, sir. Was that base? Was it overtime? Was he killing himself to work more hours or take on additional duties? I think it was all income. I believe his income before was, I mean, a cost of living adjustment of $100,000. So my point is, I think in the years leading up to the 106, I mean, it was essentially crescendoing. The income increased in 2020 and 2021 at Elmhurst. Yes. It was, $106,000 was the 2019 income. Yes. But do you know what the income was? Was there any testimony as to the income at the Aurora Police Department? Yes, I think his, it was less. I believe it was $50,000, but he was only there for a period of four months. And I think he did receive a signing bonus as well. That was a later return, but I mean, his time at that city was four months as opposed to Elmhurst, which I think was 10 years. I have the red light, so I think I'm all done. All right. Mr. Milas, thank you. Ms. Takar, reply. Thank you, Your Honor. I'd first like to address the dissipation claim. And Mr. Milas, correctly pointed out, as we noted in our brief, Jake's name does radically appear in the American Express subpoena response, which was objected to three times, including lack of foundation at R33, R38, and R34. However, there's nowhere in the subpoena response that we can see what funds Jacob used to pay any of the credit cards. Sure, there are payments that are listed under Jacob's name, but we do not know the source of these payments. We do not know if he used any funds to make said payments. Primarily, the owner of the centurion part was Tina Trahan, and the subpoena response reflects that he was only listed as an authorized user under the primary owner of Tina Trahan. Next, I'd like to... So, again, I just want to ask, assuming that he was an authorized user and Ms. Trahan was paying the bills, with this other information we had previously, wasn't the trial judge entitled to take into account this idea that gifts would be provided in lieu of income and at least on a prima facie basis shift the burden for Mr. Beltran to explain, no, that's not what was happening? Why is that an unfair determination by the trial court? Because there's testimony from Caitlin that she was receiving between February 4th in 2022 and June 24th, 2023, when Caitlin was unemployed, she had a total deposits of $127,814 in her bank account. Those were not considered as income. Those were gifts. She was getting those gifts from families and from her church. She confirmed at the time of trial she was still receiving gifts from friends and family. Well, again, but there aren't any documents from her family in the church saying we're going to pretend that this is a gift, but it's really income. Correct, Your Honor. However, it would be unfair for one party to receive gifts and for that to be construed as income, whereas the other party receives gifts and that is not considered in the calculation at all. Even regardless of where the money comes from? Correct. The law does not... It doesn't make a difference if it's your parents as opposed to a paramour? Well, parents are presumed to be gifts, so it actually strengthens the argument that Caitlin's, that the gifts that she was receiving were part of her income. Moreover, if we look at Jacob's expenses, and Mr. Milas talked about that, Caitlin testified at trial that she spent $416 on gifts every month and $583 per month in donations. I also wanted to address the fact about Jacob's income that was brought up. So, Jacob's W-2 income for 2021 was $63,000 from the city of Elmhurst and $7,000 from the city of Aurora, which can be found at sub-C 157 to 58. The trajectory of Jacob's income was his gross annual income, the party's gross annual income in 2019 was $106, in 2020 was approximately $100,000, in 2021, approximately $70,000, and in 2022, approximately $14,000. I'd also like to clarify that on appeal, we're not asking for the loans, for Jacob to not be responsible for the loans. However, we're stating that it is inequitable for Jacob to only be responsible for the loans while not being awarded any equity in their marital residence, which is a result of the trial court compounding its error by awarding Caitlin the entire equity hinged on the fact of there being a finding of dissipation, which is erroneous. I would like to conclude my argument unless the owners have any questions. Thank you very much, Mr. Carr. The court thanks both sides for a spirited argument. We will take the matter under advisement and issue a decision in due course.